## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

|  |  |  |
|---|---|---|
| **LINDA D. HUDSON,** | ) ) ) | |
| **Plaintiff,** | ) ) | |
| **v.** | ) ) | **Case No. 10-CV-2287-JAR** |
| **AIH RECEIVABLE MANAGEMENT SERVICES,** | ) ) ) | |
| **Defendant.** | ) ) ) ) | |

## MEMORANDUM AND ORDER

Plaintiff filed this action based on claims arising out of her employment at Defendant

AIH Receivable Management Services ("AIH") and her termination.  Plaintiff asserts claims

against AIH for race discrimination, harassment, hostile work environment and retaliation in

violation of Title VII of the Civil Rights Act of 1964 ("Title VII"),[1] the Kansas Act Against

Discrimination ("KAAD"),[2] and 42 U.S.C. § 1981; age discrimination and harassment in

violation of the Age Discrimination in Employment Act ("ADEA")[3] and the KAAD; sexual

harassment and hostile work environment in violation of Title VII and the KAAD; and whistle-

blower retaliation in violation of Kansas law.  This matter is before the Court on Defendant's

Motion for Summary Judgment (Doc. 92).  The motion is fully briefed and the Court is prepared

to rule.  As described more fully below, the Court grants in part and denies in part AIH's motion

---

[1] 42 U.S.C. § 2000e, *et seq.*

[2] K.S.A. § 44-1001, *et seq.*

[3] 29 U.S.C. § 621, *et seq.*

for summary judgment.

## I.      Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates "that there is no genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law."[4] In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[5] "There is no genuine issue of material fact unless the evidence, construed in the light most favorable to the non-moving party, is such that a reasonable jury could return a verdict for the non-moving party."[6] A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[7] An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[8]

The moving party initially must show the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.[9] In attempting to meet this standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the nonmovant's claim; rather, the movant need simply point out to the court a lack of evidence for the nonmovant on an

---

[4]Fed. R. Civ. P. 56(a).

[5]*City of Herriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010).

[6]*Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 255 (1986)).

[7]*Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[8]*Adler*, 144 F.3d at 670 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[9]*Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002), *cert. denied* 537 U.S. 816 (2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

essential element of the nonmovant's claim.[10]

Once the movant has met the initial burden of showing the absence of a genuine issue of material fact, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[11]  The nonmoving party may not simply rest upon its pleadings to satisfy its burden.[12]  Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[13]

Finally, summary judgment is not a "disfavored procedural shortcut"; on the contrary, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[14]  In responding to a motion for summary judgment, "a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial."[15]  When examining the underlying facts of the case, the Court is cognizant that it may not make credibility determinations or weigh the evidence.[16]

---

[10]*Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler,* 144 F.3d at 671); *see also Kannady v. City of Kiowa,* 590 F.3d 1161, 1169 (10th Cir. 2010).

[11]*Anderson,* 477 U.S. at 256; *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986); *Spaulding v. United Transp. Union,* 279 F.3d 901, 904 (10th Cir. 2002), *cert. denied* 537 U.S. 816 (2002) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)).

[12]*Anderson,* 477 U.S. at 256; *accord Eck v. Parke, Davis & Co.,* 256 F.3d 1013, 1017 (10th Cir. 2001).

[13]*Mitchell v. City of Moore, Okla.,* 218 F.3d 1190, 1197–98 (10th Cir. 2000) (quoting *Adler,* 144 F.3d at 670–71); *see Kannady v. City of Kiowa,* 590 F.3d 1161, 1169 (10th Cir. 2010).

[14]*Celotex,* 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

[15]*Conaway v. Smith,* 853 F.2d 789, 794 (10th Cir. 1988).

[16]*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

II.     **Evidentiary Objections**

AIH has asserted various objections to Plaintiff's factual contentions.  Plaintiff's response to the summary judgment motion sets forth 154 additional statements of fact ("ASF"). AIH did not object to ASF 10, but rather reworded it.  AIH objected to the remaining 153 ASFs. Although AIH's objections tend to consist of standard, repetitive recitations, the Court will address the two main objections set forth by AIH.

AIH objects to copies of pages from Plaintiff's journal that are attached all together as an exhibit to her response to the summary judgment motion.[17]  AIH objects that the journal pages fail to comply with Local Rule 56.1(d) in that the materials cited consist of neither affidavit, declaration, pleading, deposition, interrogatory answer, nor response to a request for admission.[18] AIH makes a valid argument.  Although Plaintiff testifies regarding the journal entries in her deposition and the deposition makes reference to marking some of the pages as exhibits to the deposition, the Court was presented with an exhibit to the summary judgment response that includes several pages without a clear marking as to which pages were exhibits to the deposition. The Court will disregard the exhibit.

AIH also objects to various depositions and affidavits as consisting of inadmissible hearsay.  In order to constitute hearsay, the statement in question must be offered to prove the matter asserted.[19]  Most of the challenged statements are submitted to show what racist or sexist comments were made in the workplace — clearly those are not asserted for the truth of the

---

[17] *See* Doc. 116-4.

[18] *See* D. Kan. R. 56.1(d).

[19] *See* Fed. R. Evid. 801(c).

statements made.  Other assertions deal with statements made by management in response to complaints that were lodged.  Again, they are submitted to show management's response, not to show that the response consisted of a truthful assertion.  The Court will disregard the alleged facts that do contain inadmissible hearsay.  Likewise, the Court will ignore factual assertions that are immaterial, unsupported by affidavits and/or unauthenticated by admissible documents.  The Court also disregards conclusory statements.

## III.   Uncontroverted Facts

The following facts are either uncontroverted, stipulated to, or viewed in the light most favorable to Plaintiff.

Defendant AIH is a debt collecting company.  Charles Holtgraves is the President of AIH, Martha Thornhill is AIH's Vice President,[20] and Toni Booze is Vice President of Operations.[21]  Throughout 2008 and 2009, AIH employed no more than fourteen individuals during any given week.  AIH hired Plaintiff Linda Hudson, an African-American female, on November 21, 2001, as a collector.

In the Fall of 2008, Ms. Thornhill and Mr. Holtgraves re-hired Travis Joyce.  He had previously worked for AIH, but he testified that he was terminated for "job abandonment."[22]  Plaintiff testified that she knew why AIH hired Mr. Joyce, it was because "Martha wanted to bring in someone else with different techniques and talents.  And he was — they threatened the

---

[20]Doc. 93-1, ¶ 2; Doc. 93–10, ¶ 2.

[21]Doc. 93-15, ¶ 2.

[22]Doc. 116-12, at 63: 23–24.

other employees to bring in another collector if they didn't start performing."[23]  Christine Blake, who was employed at AIH as a collector from March 3, 2008 to May 29, 2009, stated that "[p]rior to hiring Travis Joyce, Martha Thornhill said at monthly staff meetings that she would hire her 'drama queen' friend to replace certain collectors because she was not happy with the amount of collections.  Martha Thornhill mentioned Travis Joyce by name as the 'super collector' she intended to hire."[24]

Plaintiff described her working relationship with Mr. Joyce:

A.   I really worked with him the first day of training to just kind of update him on the system.  And he was very rude, boisterous.  No matter what I said it made no difference because he reminded me that Martha was his friend and whatever he told her would go.  So I —  unpleasant, I would have to say.

Q.   Would you say that your relationship with Travis Joyce was unpleasant from the very first day of you two working together?

A.   Yes.  Uncomfortable.[25]

     . . . .

Q.   What complaints did you have of Travis at that early date?

A.   The way that Travis would talk to me.  My responsibility was to — even though he had prior knowledge of the system was just to update him how AIH worked prior to him coming back to the company.  No matter what I showed him or what I did, Travis had a rebuttal or: I didn't know nothing.  I was dumb.  I was stupid.  I wasn't his boss.  Martha was his boss.  Whatever he'd tell Martha she would believe.  You know, so I — there was nothing I could literally do or show Travis or — so we started off difficult.[26]

Plaintiff did not socialize with Mr. Joyce, nor did she have a friendly, cordial relationship

---

[23]Doc. 116-2, at 76: 5–13.

[24]Doc. 116-6, ¶ 2.

[25]Doc. 116-2, at 79: 4–16.

[26]*Id.* at 118: 12–25.

with him.  Plaintiff kept detailed personal notes describing issues that were happening at AIH, including faults in Mr. Joyce's work.  Plaintiff testified she was frustrated and that she believed Mr. Joyce was not doing his fair share of the work.[27]  Plaintiff found Mr. Joyce to be rude and disrespectful.

Plaintiff testified that, within a couple of days after he started at AIH, Mr. Joyce quoted lines from *The Color Purple* every few days, like "I may be black, I may be poor, I may be ugly, but dear God, I'm here."[28]  Plaintiff was offended by Mr. Joyce's frequent quoting of lines from *The Color Purple* because she felt that he was making fun of the terrible plight of the characters in the movie.

Plaintiff testified that Mr. Joyce called her a "Nigger Bitch" twice — once in October and once in November of 2008.[29]  Plaintiff also testified that Mr. Joyce told co-worker Ben Kind, "I'll throw a nigger up under the bus at any chance I get."[30]  Ms. Blake stated that Mr. Joyce would consistently make offensive comments about African-American debtors, such as they "don't work, they just sit on their asses and collect welfare."  She also remembered him talking about the KKK.[31]  Plaintiff testified that there were "just so many" things Mr. Joyce would say blatantly out loud, like—"If I was a black female, I'd want to be a rapper.  I'd want my name to be sexy chocolate."  Plaintiff stated that Ms. Booze would remind Mr. Joyce that she "thought we weren't going to do the racial remarks today," to which he would respond "I know, I forgot

---

[27]*Id*. at 294: 23–295: 17.

[28]*Id.* at 194: 4–21.

[29]*Id.* at 184: 13–185: 13.

[30]*Id.* at 181: 2–9.

[31]Doc. 116-6, ¶ 4.

there's a snitch in the office."[32]

Plaintiff testified that Ms. Booze, Mr. Holtgraves and Ms. Thornhill were all in the room when Mr. Joyce was making his racist comments, and that they did not do anything that she was aware of to protect her from these inappropriate comments or hostile behavior.[33]

Plaintiff testified that Mr. Joyce, an openly-gay man, also talked about the people he dated, their professions, who was the "batter" and who was the "catcher." Plaintiff testified that he used this analogy a few times, none of it was directed at her, but she overheard him because he would stand up and blatantly say those things. A lot of the conversations would go on between Mr. Joyce and Ms. Booth.[34] Ms. Blake likewise stated that Mr. Joyce would openly discuss with Ms. Booze his sexual activities, within earshot of the other collectors.[35] She specifically recalled that on one occasion Mr. Joyce told Ms. Booze about a local police officer and the sexual activities they were either engaging in or that he wanted to engage in with this officer.[36]

Plaintiff and Mr. Joyce worked closely together on the same collection route from October 2008, to February 2009. Plaintiff's average monthly commission during the eight months prior to Mr. Joyce's arrival was $387.04. Mr. Joyce and Plaintiff worked together for a period of approximately four months. For the four-month period that Mr. Joyce and Plaintiff worked together, the combined average commission was $1,523.38, nearly four times Plaintiff's

---

[32]Doc. 116-2, at 182: 1–17.

[33]Doc. 116–2, at 359: 4–17.

[34]*Id.* at 187: 7–188: 9.

[35]Doc. 116-6, ¶ 3.

[36]*Id.* ¶ 6.

average monthly commission for the previous eight months.

On January 28, 2009, AIH announced that Plaintiff would be moved[37] to a medical route, effective February 1, 2009, so that she would not be forced to work with Mr. Joyce.  Plaintiff described her calendar at her deposition:

Q.      Okay.  Can you please read me the—your entry on the January 28th?
A.      It says: Met Chuck at 3:50, moved me— moved me to E–1.
Q.      What is E–1?
A.      That's medical.
Q.      Okay.  Is that accurate?
A.      I wasn't physically moved, so I guess that's the date that they told me.
Q.      Okay.  And what else does it say there on —
A.      It says —
Q.      — the 28th?
A.      — I needed to work by myself.  And then it says: No good will come of this — them.[38]

Plaintiff further testified regarding her transfer:

Q.      So after your transfer to the medical route, did your duties change at all?
A.      No.
Q.      You were just collecting on medical accounts, rather than financial accounts; is that correct?
A.      Correct.
Q.      And at this point you're not working side by side with Travis Joyce; is that correct?
A.      That would be correct.
Q.      Did your pay change when you moved financial to medical?
A.      No.[39]

. . . .

Q.      And does that affect your job as a collector whether you're doing medical or financial?
A.      No.

---

[37]The parties dispute whether the move was a lateral transfer or a demotion.  The Court will discuss this issue in the discussion portion of this opinion.

[38]Doc. 116-2, at 267: 9–25.

[39]*Id.* at 138: 11–23.

Q.    Pretty much the same thing?
A.    Yes.
Q.    Because a debt is a debt, and you're trying to collect for your client?
A.    Yes.[40]

. . . .

Q.    Okay.  And you have no reason to believe you were demoted, only transferred; is that correct?
A.    Correct.[41]

. . . .

Q.    Were you upset that you got moved to the medical route?
A.    Yes.
Q.    Why were you upset?
A.    Anybody would be upset being moved after doing the job for so long.

. . . .

Q.    Would you say that the routes are pretty much equivalent?
A.    As far as?
Q.    Bonus potential or commission potential.
A.    If you perform your job.[42]

Plaintiff testified that prior to October 2, 2008, which was the date that Mr. Joyce started, no AIH employees ever said anything to her that was racially offensive, sexually offensive or sexually charged.  She testified that Mr. Joyce is the only person at AIH that said anything to her that was sexist or racially offensive.[43]  Plaintiff was never physically assaulted by an employee of AIH.  Plaintiff stated that she was not aware of any AIH employee using their AIH computer to look at racist or sexist materials.  Although Plaintiff alleges that Mr. Joyce's comments were

---

[40]*Id.* at 55: 10–18.

[41]*Id.* at 239: 13–16.

[42]*Id.* at 210: 12–211: 6.

[43]*Id.* at 179: 20–180: 13.

made in front of management and where everyone could hear him, she admits that Mr. Joyce did not direct sexually offensive language at her.[44]

Plaintiff stated that she complained to two managers about Mr. Joyce's alleged racist and sexist conduct:  Ms. Booze and Ms. Thornhill.  Plaintiff testified that she complained to Ms. Thornhill on three occasions about the incidents involving Mr. Joyce.  The first time was in early October, the next time was at the end of October, and the last time was possibly in mid-November.  Plaintiff testified that Ms. Thornhill laughed in her face, told her she could either get over it or quit, and shunned her.[45]  Plaintiff also testified that she complained to Ms. Booze seven or eight times about Mr. Joyce's conduct, and Ms. Booze told her to just accept it because Mr. Joyce was "Martha's boy."[46]  When asked when was the last time she talked to Ms. Booze about Mr. Joyce, she answered:

> A.   I'm going to have to say maybe — I'm not — he was off for a couple of weeks and I think that was like in November or something to that effect, somewhere in that area.  I can't remember exactly when it was, November, December.  I can't remember exactly what the dates were.[47]

Plaintiff complained on or about October 15, 2008, to Libby Hamrick, Accounting Manager, about being "picked on by Martha since Travis started," etc.  Ms. Hamrick discussed the issues with Mr. Holtgraves after Plaintiff met with him about the issues.  AIH neither documented nor investigated the complaints.[48]

---

[44]*Id*. at 192: 1–4.

[45]*Id.* at 202: 9–205: 14.

[46]*Id.* at 206: 14–17, 89: 22– 90: 4.

[47]*Id*. at 206: 20–25.

[48]Doc. 116-21.

Ms. Blake stated that she personally complained to Ms. Thornhill on numerous occasions about Mr. Joyce's racist and sexual statements, but was advised to "get over it or to find a new job."[49]  AIH offered no formal training or updates to its managers and supervisors about discrimination or harassment laws.

Plaintiff testified that she could not focus on work and she was constantly fearful of what else Mr. Joyce and Plaintiff's supervisors would say or do.  She said it was very stressful and has caused her to lose sleep since October of 2008.[50]

Ms. Booze stated that after AIH transferred Plaintiff to the medical route, she witnessed Plaintiff playing computer games on AIH computers during work hours.[51]  Plaintiff testified that she played solitaire one time at work, and it was during her regular afternoon break.[52]

Plaintiff testified that in 2003 or 2004 she was promoted to collection floor supervisor. She stated that her duties included training, interviewing, hiring and assisting anyone with questions.[53]  She testified that between January 28, 2009, and February 10, 2009, AIH did not interview any potential hires nor was there a need for training of new individuals.[54]  Plaintiff testified regarding her supervisor status:

Q.      On the morning of February 10th, 2008[sic], what was your title at AIH?
A.      I was still floor collector but—
Q.      What were your responsibilities?

---

[49]Doc. 116-6, ¶ 7.

[50]Doc. 116-2, at 251: 4–17.

[51]Doc. 93-15, ¶ 12.

[52]Doc. 116-2, at 100: 10–18.

[53]*Id.* at 56–57.

[54]*Id.* at 65: 3–22.

. . . .

A.    It was to just go to my desk and to collect off medical.
Q.    Is it your testimony that you were no longer a supervisor at that point?
A.    No.
Q.    That's not your testimony?
A.    No.
Q.    You were still a supervisor?
A.    I was.
Q.    Okay.  Did AIH ever demote you?
A.    No, not that I'm aware of.[55]

Plaintiff testified that when she initially started working at AIH in 2001, the company had ten or twelve collectors.[56]  AIH had eleven employees in January 2008 and eleven employees in December 2009—nine months after Plaintiff was terminated.[57]  AIH hired six new collectors within six months of discharging Plaintiff.[58]  AIH advertised for the positions and did not call Plaintiff to see if she would like to be rehired.[59]

Ms. Thornhill testified that she runs the collection reports once a month and then sends them by e-mail to the collectors and payroll.[60]

Plaintiff predicates her claim of whistle-blower retaliation on an incident in which Mr. Joyce impersonated a debtor-patient in order to have a Coventry insurance payment directed to North Kansas City Hospital.  North Kansas City Hospital hired AIH to assist it in collecting its unpaid medical debt.  Mr. Joyce called Coventry and represented himself as the debtor-

---

[55]Doc. 116-2, at 63: 22–64: 14.

[56]*Id.* at 56: 4–9.

[57]Doc. 93, SOF ¶ 3.

[58]*Id.*

[59]Doc. 116-3, at 75: 20–76: 2.

[60]Doc. 116-9, at 45: 10–14.

patient.  Mr. Joyce used the debtor-patient's personal information to impersonate the debtor-patient and requested that Coventry mail an insurance check to AIH's P.O. Box, which he represented to be the debtor-patient's mailing address.[61]

On that same day, January 29, 2009, Plaintiff called Coventry to report the incident, because she believed a crime had been committed and she wanted to let it know that her coworker had called in and pretended to be someone else.  Plaintiff told Coventry her name was Megan Alterman, another AIH collector, because she was caught off guard and was scared of losing her job.

Plaintiff testified that from January 29th to the end of the day on February 10th, she did not tell anyone that she had called Coventry, and she did not, during that time, report Mr. Joyce's identity theft to anyone other than Coventry.  She said that she did not tell Mr. Holtgraves, Ms. Thornhill or Ms. Booze about Mr. Joyce's identity theft.[62]  Other than Plaintiff's husband, who is a sheriff's deputy and was aware of her actions to stop the identity theft, Plaintiff had no contact with law enforcement regarding Mr. Joyce's impersonation until after her termination.

Ms. Blake stated that Plaintiff was extremely upset and Ms. Thornhill and Mr. Joyce witnessed Plaintiff getting upset and leaving.  Ms. Blake also stated that she accessed the account at Plaintiff's request and provided her the account information and contact information she used to report the incident to Coventry and to the debtor-patient.[63]

Plaintiff testified that she believed that people at AIH knew she was the one that

---

[61]Doc. 116-12, at 43: 22–44: 16.

[62]Doc. 116-2, at 223: 11– 225: 6.

[63]Doc. 116-6, ¶ 16.

14

contacted Coventry because of the comments that were made when she returned to work. Plaintiff testified that Mr. Joyce "made the comment that a lady had called in, [the debtor-patient's] wife or girlfriend had called in and said an angel in their office had called Coventry and told Coventry that they were trying to fraud [the debtor-patient]. In all his life and years of collections he had never known anyone to do anything so unethical." Plaintiff testified "[t]hat's when he made a comment at that point in time that I was too dumb to know that — I was too black and dumb to know that I was demoted, so yes."[64] Plaintiff also testified that after Mr. Joyce made these comments, Ms. Thornhill treated Plaintiff like she was nonexistent, and if Plaintiff asked her a question, she really didn't talk to Plaintiff, didn't respond and shunned her.[65]

Plaintiff was terminated on February 10, 2009. Plaintiff testified that she was terminated ten or eleven days after she reported Mr. Joyce's illegal behavior to Coventry.[66]

Plaintiff submits several alleged facts to show that various cover-ups, intimidations and lies were committed during the investigation of the alleged identity theft. The Court finds that these facts are not material to the issues before the Court. When examining the underlying facts of the case for purposes of summary judgment, the Court does not make credibility determinations.

## IV.    Title VII

Plaintiff filed claims for race discrimination, harassment, hostile work environment and retaliation in violation of Title VII. An employer must employ a minimum number of employees

---

[64]Doc. 116-2, at 354: 12–355: 10.

[65]*Id.* at 355: 20–356: 5.

[66]*Id.* at 357: 15–18.

to fall within the scope of Title VII and be considered an "employer," as defined by the Act.

Under 42 U.S.C. § 2000e(b), an "employer" "means a person engaged in an industry affecting

commerce who has fifteen or more employees for each working day in each of twenty or more

calendar weeks in the current or preceding calendar year . . . ."   Whether AIH is an "employer"

under Title VII is an element of Plaintiff's claim for relief, not a jurisdictional issue.[67]   The

Supreme Court discussed the standard applicable in determining the fifteen-employee threshold

in *Walters v. Metropolitan Educational Enterprises, Inc.*[68]:

> As we have described, in determining the existence of an
> employment relationship, petitioners look first and primarily to
> whether the individual in question appears on the employer's
> payroll.  Metropolitan did not challenge this aspect of petitioners'
> approach; its objection was the more basic one that existence of an
> employment relationship was not the criterion.  For their part,
> petitioners emphasize that what is ultimately critical under their
> method is the existence of an employment relationship, not
> appearance on the payroll; an individual who appears on the
> payroll but is not an "employee" under traditional principles of
> agency law, *see, e.g., Nationwide Mut. Ins. Co. v. Darden*, 503
> U.S. 318, 323-324, 112 S.Ct. 1344, 1348-1349, 117 L.Ed.2d 581
> (1992), would not count toward the 15-employee minimum. We
> agree with petitioners that the ultimate touchstone under
> § 2000e(b) is whether an employer has employment relationships
> with 15 or more individuals for each working day in 20 or more
> weeks during the year in question.[69]

In applying the payroll rule, the Court explained, "[u]nder the interpretation we adopt . . . all one

needs to know about a given employee for a given year is whether the employee started or ended

employment during that year and, if so, when.  He is counted as an employee for each working

---

[67]*Arbaugh v. Y&H Corp.*, 546 U.S. 500, 504, 516 (2006).

[68]519 U.S. 202 (1997).

[69]*Id.* at 211–12.

16

day after arrival and before departure."[70]

Plaintiff acknowledges that AIH does not qualify as an "employer" under Title VII.  It is undisputed that throughout 2008 and 2009, AIH employed no more than fourteen individuals during any given week.[71]  Therefore, AIH is entitled to summary judgment on Plaintiff's Title VII claims.

## V.    Age Discrimination

Plaintiff also alleges age discrimination claims pursuant to the ADEA and the KAAD.  Plaintiff's claim for age discrimination under the ADEA also must fail.  The term "employer" as used in the ADEA, is defined as "a person engaged in an industry affecting commerce who has twenty or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year."[72]  Plaintiff acknowledges that AIH does not qualify as an "employer" under the ADEA.  Plaintiff also asserts that she is no longer pursuing an age discrimination claim under the KAAD, because the act does not provide age protection prohibitions.[73]  Therefore, AIH is entitled to summary judgment on Plaintiff's age discrimination claims under the ADEA and the KAAD.

Thus, the Court is left with determining whether summary judgment is appropriate regarding the following causes of action: racially hostile work environment under § 1981 and the KAAD; sexually hostile work environment under the KAAD; retaliation under § 1981 and the

---

[70]*Id.* at 211.

[71]Doc. 93, SOF ¶ 2.

[72]29 U.S.C. § 630(b).

[73]*See* K.S.A. § 44-1001 (stating "'[u]nlawful discriminatory practice' means . . . any discrimination against persons, by reason of their race, religion, color, sex, disability, national origin or ancestry.")

KAAD; and whistle-blower retaliation under Kansas law.[74]

## VI.    Racially Hostile Work Environment Under § 1981 and the KAAD

Federal cases construing Title VII have been used as persuasive authority by the Kansas courts in interpreting and applying the KAAD,[75] and the elements of a plaintiff's case are the same under § 1981 and Title VII.[76]  To survive summary judgment on a hostile work environment claim, a plaintiff must show that "under the totality of the circumstances, the harassment was pervasive or severe enough to alter the terms, conditions, or privileges of employment, and that the harassment was based on or stemmed from his race."[77]  Plaintiff must establish that the environment would be "reasonably perceived (objectively), and is perceived (subjectively), as hostile or abusive."[78]  In addition, a plaintiff must be able to point to "more than a few isolated incidents of racial enmity."[79]  "Mere snubs, unjust criticisms, and discourteous conduct are not actionable; to establish a hostile work environment, plaintiff must show that the alleged harassment is excessive, opprobrious, and more than casual

---

[74]Although Plaintiff's theories of recovery are stated differently throughout her pleadings, the essential elements for her theories of recovery set forth in the Pretrial Order show that her discrimination claims are based on a hostile work environment.  *See* Doc. 109, Pretrial Order, at 5–8.

[75]*See, e.g., Labra v. Mid–Plains Constr., Inc.,* 90 P.3d 954, 957 (Kan. Ct. App. 2004); *see also Best v. State Farm Mutual Auto. Ins. Co.,* 953 F.2d 1477, 1480 n.2 (10th Cir. 1991); *Cubie v. Bryan Career Coll., Inc.,* 244 F. Supp. 2d 1191, 1200 (D. Kan. 2003).

[76]*Drake v. City of Fort Collins,* 927 F.2d 1156, 1162 (10th Cir. 1990).

[77]*Stewart v. Bd. of Comm's for Shawnee County, Kansas,* 216 F. Supp. 2d 1265, 1278 (D. Kan. 2002) (citations omitted).

[78]*Lewis v. Standard Motor Prods., Inc.,* 203 F. Supp. 2d 1228, 1235 n.31 (D. Kan. 2002) (citing *Nieto v. Kapoor,* 268 F.3d 1208, 1220 (10th Cir. 2001) (citations omitted)).

[79]*Id.* (citations omitted).

conversation."[80]  This Court has held that:

> Harassment must be sufficiently severe or pervasive, and the court should consider all of the circumstances, including: the frequency of the discriminating conduct; its severity; whether it is physically threatening or humiliating or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.[81]

Plaintiff and Mr. Joyce worked together from October 2008, to February 2009.  Plaintiff testified that on Mr. Joyce's first day of training, he reminded Plaintiff that Martha was his friend and that whatever he told her would go.  Starting a couple of days after he started at AIH, Mr. Joyce began quoting lines from *The Color Purple* every few days, like "I may be black, I may be poor, I may be ugly, but dear God, I'm here."  Plaintiff alleges that one of Mr. Joyce's recurring harassment techniques was to quote movie lines from the movie *The Color Purple* while looking right at Plaintiff.  Plaintiff testified that Mr. Joyce called her a "Nigger Bitch" twice—once in October and once in November of 2008.  Plaintiff also testified that Mr. Joyce told co-worker Ben Kind, "I'll throw a nigger up under the bus any chance I get."  The Court finds that Plaintiff has shown that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment.

To hold an employer liable for the racially discriminatory comments or conduct of non-supervisory employees, a plaintiff "must prove that Defendant knew or should have known of

---

[80]*Stewart v. Bd. of Comm's for Shawnee Cnty., Kan.,* 216 F. Supp. 2d 1265, 1280 (D. Kan. 2002) (citing *Garcia-Paz v. Swift Textiles, Inc.,* 873 F. Supp. 547, 561-62 (D. Kan. 1995)).

[81]*Id.* (citing *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998)).

the harassment and failed to take prompt and effective remedial action."[82]  Viewing the evidence

in the light most favorable to Plaintiff, Plaintiff and other employees made several complaints to

Ms. Thornhill and Ms. Booze.  Ms. Thornhill responded to the complaints by laughing and

telling them to "get used to it or quit."  Plaintiff also complained to Libby Hamrick, AIH's

accounting manager, and Ms. Hamrick discussed the issues with Mr. Holtgraves after Plaintiff

met with him about the issues.  Plaintiff testified that Ms. Booze, Mr. Holtgraves and Ms.

Thornhill were all in the room when Mr. Joyce was making his racist comments, and that they

did not do anything that she was aware of to protect her from these inappropriate comments or

hostile behavior.  Despite this knowledge of the harassing and discriminatory conduct of

Mr. Joyce, AIH did nothing to stop the behavior.  AIH neither documented nor investigated the

complaints.  Defendant's motion for summary judgment must be denied on Plaintiff's claim of a

racially hostile work environment.

## VII.   Sexually Hostile Work Environment Under the KAAD

Plaintiff has failed to state a prima facie case of a sexually hostile work environment.  To

establish the existence of a sexually hostile work environment, Plaintiff must prove the following

elements: (1) she is a member of a protected group; (2) she was subjected to unwelcome

harassment; (3) the harassment was based on sex; and (4) due to the severity or pervasiveness of

the harassment, the harassment altered a term, condition, or privilege of her employment and

created an abusive working environment.[83]

---

[82]*Stewart*, 216 F. Supp. 2d at 1279 (citations omitted); *see also Ford v. West,* 222 F.3d 767, 775 (10th Cir. 2000) (stating that to survive summary judgment under Title VII, the record must support an inference of a racially hostile work environment *and* a basis for employer liability).

[83]*Stevens v. Water Dist. One of Johnson Cnty.,* 561 F. Supp. 2d 1224, 1243–44 (D. Kan. 2008) (citations and quotations omitted).

A sexually hostile work environment "must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so."[84]  The test for whether an environment is "hostile" or "abusive" is not a mathematically precise one, and the court must look at all the circumstances and consider factors such as "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."[85]  "Simple teasing, offhand comments, and isolated incidents, unless extremely serious, will not suffice."[86]  "[T]he standards for hostile environment are intended to filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing."[87]

Plaintiff has failed to come forward with evidence of sexual harassment sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment.  Furthermore, the record does not support a finding that the conduct at issue was based on Plaintiff's sex.  Although the Court is cognizant that "conduct which is not gender-based may form a part of the context or environment in which the discriminatory conduct is alleged to have occurred,"[88] in this case Plaintiff has not shown that the underlying

---

[84]*Labra v. Mid-Plains Constr., Inc.,* 90 P.3d 954, 960 (Kan. Ct. App. 2004).

[85]*Dunegan v. City of Council Grove, Kansas Water Dept.,* 77 F. Supp. 2d 1192, 1198 (D. Kan. 1999) (citing *Faragher v. City of Boca Raton,* 524 U.S. 775, 787-88 (1998)).

[86]*Labra,* 90 P.3d at 960 (*citing Faragher v. Boca Raton,* 524 U.S. 775, 788 (1998)).

[87]*Id.*

[88]*Land v. Midwest Office Techn., Inc.,* 114 F. Supp. 2d 1121, 1136 (D. Kan. 2000) (quoting *O'Shea v. Yellow Techn. Servs., Inc.,* 185 F.3d 1093, 1097 (10th Cir. 1999)).

discriminatory conduct was motivated by gender animus.[89]     The evidence, construed in the light most favorable to Plaintiff, is that Mr. Joyce made several comments about his own sexual preferences and activities.  Although the comments were offensive, the incidents, taken as a whole, do not show a pervasive use of gender-based discrimination such that the conduct would unreasonably interfere with Plaintiff's work environment.  The incidents were not physically threatening or humiliating, occurred infrequently, and were not severe.  The comments were not directed at Plaintiff, but rather she overheard Mr. Joyce's conversations with Ms. Booze.  Although the Court recognizes that "the severity and pervasiveness is particularly unsuited for summary judgment because it is 'quintessentially a question of fact,'" when a plaintiff's allegations, even if believed by a jury, could not constitute a severe and hostile work environment, a court may enter summary judgment against the plaintiff.[90]

The Court finds that, construing the evidence in a light most favorable to Plaintiff, a reasonable jury could not find a prima facie case of hostile work environment sexual harassment.  Thus, the Court grants AIH's motion for summary judgment on Plaintiff's sexually hostile work environment claim.

## VIII.   Retaliation Under § 1981 and the KAAD

The requirements to establish retaliation are identical under § 1981 and Title VII, and therefore "the principles set forth in Title VII retaliation cases apply with equal force in § 1981

---

[89]*See Dunegan v. City of Council Grove, Kan. Water Dep't.,* 77 F. Supp. 2d 1192, 1198 (D. Kan. 1999) (citing *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 79–80 (1998)).

[90]*Stevens v. Water Dist. One of Johnson Cnty.,* 561 F. Supp. 2d 1224, 1245 n.54 (D. Kan. 2008) (citing *O'Shea,* 185 F.3d at 1098.

22

cases."[91]   Because there is no direct evidence of retaliation, the Plaintiff must rely on the burden-

shifting analysis in *McDonnell Douglas Corp. v. Green,*[92] to prove retaliation indirectly.[93]   Under

the burden-shifting framework established in *McDonnell Douglas*, the plaintiff carries the initial

burden of establishing a prima facie case of retaliation by showing "(1) that [s]he engaged in

protected opposition to discrimination, (2) that a reasonable employee would have found the

challenged action materially adverse, and (3) that a causal connection existed between the

protected activity and the materially adverse action."[94]   If the plaintiff can establish a prima facie

case, the burden shifts to the employer to offer a legitimate, nonretaliatory reason for its

decision.[95]   Once the employer has satisfied this burden of production, the plaintiff must show

that the employer's proffered reason is merely a pretext for retaliation.[96]

      Plaintiff's internal complaints to her superiors constitute protected activity.   She alleges

several "adverse actions": 1) her transfer from financial collections to medical collections; 2) her

loss of supervisor status; 3) Mr. Joyce's harassment; and 4) her termination.

      1)    <u>Transfer from Financial to Medical Collections</u>

      Plaintiff alleges that her transfer from financial collections to medical collections was an

adverse action, because it was a demotion, as opposed to a lateral transfer.   Plaintiff admitted

---

[91]*Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 998 (10th Cir. 2011).

[92]411 U.S. 792, 802 (1973).

[93]*Twigg*, 659 F.3d at 998 (citations omitted).

[94]*Id.* (citing *Somoza v. Univ. of Denver*, 513 F.3d 1206, 1212 (10th Cir. 2008)) (internal quotation marks omitted).

[95]*Id.* (citing *Somoza*, 513 F.3d at 1211).

[96]*Id.*

that she had similar responsibilities and pay at her new assignment.  Although Plaintiff points to Mr. Joyce's statement that she was "too black and dumb" to realize that she had been demoted, his opinion is irrelevant.  Employment actions that amount to neutral change or inconvenience are not "adverse employment actions."[97]  Further, "if a transfer is truly lateral and involves no significant changes in an employee's conditions of employment, the fact that the employee views the transfer either positively or negatively does not of itself render the denial or receipt of the transfer [an] adverse employment action."[98]  Even Plaintiff's own testimony shows that the transfer was not an adverse employment action.  However, even assuming Plaintiff could establish a prima facie case of retaliation with regard to her transfer, she has failed to show AIH's proffered legitimate reasons for the transfer are pretextual.

AIH offered legitimate, non-retaliatory reasons for its decision to transfer Plaintiff to medical collections.  AIH alleges that it transferred Plaintiff to her new position so that she would not have to work with Mr. Joyce.  AIH asserts that it transferred Plaintiff, rather than Mr. Joyce, because Mr. Joyce was a significantly more productive collector than Plaintiff.  It is undisputed that Plaintiff's average monthly commission during the eight months prior to Mr. Joyce's arrival was $387.04.  Mr. Joyce and Plaintiff worked together for a period of approximately four months; during those four months, the combined average commission was $1,523.38, nearly four times Plaintiff's average monthly commission for the previous eight months.[99]

---

[97]*Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 532 (10th Cir. 1998).

[98]*Id.* at n.6.

[99]Doc. 93, SOF ¶¶ 22, 26, 27.

24

Pretext can be shown by pointing out "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-[retaliatory] reasons."[100] Mere conjecture that the employer's explanation is pretext is insufficient to defeat summary judgment.[101]

Plaintiff suggests that because of her tenure and past performance, she should have retained the financial collections route.  However, a plaintiff's own conclusory opinions about her qualifications do not give rise to a material factual dispute.[102]  Otherwise, summary judgment would never be appropriate in employment discrimination claims, because plaintiffs bringing such claims always feel that they should have retained their job, been promoted, or been hired instead of another candidate.  The real issue is whether the decision-maker had an honest belief that plaintiff was not qualified.[103]  The plaintiff must call into question the honesty or good faith of the employer's assessment of her abilities.[104]  "It is not enough that a factfinder could disagree

---

[100]*Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) (citations omitted).

[101]*Temple v. Auto Banc of Kan., Inc.,* 76 F. Supp. 2d 1124, 1132 (D. Kan. 1999) (citing *Anderson v. Coors Brewing Co.,* 181 F.3d 1171, 1179 (10th Cir. 1999) (citation omitted)).

[102]*See Campbell v. Meredith Corp.*, 260 F. Supp. 2d 1087, 1106 (D. Kan.), *rev. denied*, 2003 WL 21302952 (D. Kan. 2003) ("Plaintiff's only evidence is his subjective belief that his termination was discriminatory.  Plaintiff's feeling that he has been the victim of discrimination fails to demonstrate a genuine issue of fact absent supporting evidence."); *Simms v. Oklahoma ex rel Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1329 (10th Cir. 1999), *cert. denied*, 528 U.S. 815 (1999) ("[A]n employee's own opinions about his . . . qualifications [do not] give rise to a material factual dispute.") (citation omitted); *Reese v. Owens-Corning Fiberglass Corp.*, 31 F. Supp. 2d 908, 916-17 (D. Kan. 1998) ("It is well settled that subjective beliefs of discrimination are not sufficient to defeat summary judgment.") (citing *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1408 n.7 (10th Cir. 1997)).

[103]*Pippin v. Burlington Res. Oil & Gas Co.*, 440 F.3d 1186, 1196 (10th Cir. 2006) ("Finally, although Pippin certainly thinks he was well qualified and a good performer, '[i]t is the perception of the decision maker which is relevant, not plaintiff's perception of [him]self.") (citation omitted).

[104]*See Exum v. U.S. Olympic Comm.*, 389 F.3d 1130, 1137 (10th Cir. 2004) ("Although Plaintiff obviously has his own opinion about his leadership and managerial skills, he has not demonstrated a genuine factual dispute about the genuineness of the USOC's assessment of his abilities.").

with the employer's assessments.  'The relevant inquiry is not whether [the defendant's] proffered reasons were wise, fair or correct, but whether [it] honestly believed those reasons and acted in good faith upon those beliefs."[105]

Although Plaintiff may argue that she should have remained on the financial collection route and Mr. Joyce should have been transferred to the medical collections route, "[j]udgments such as these are not, however, for this court to make, and the court will not second-guess the employer's judgment in a business decision."[106]

        2)    <u>Loss of Supervisor Status</u>

Plaintiff also alleges that she lost supervisor status that she previously held, which constituted an adverse employment action.  In support of her argument that she lost her supervisor status, she relies on testimony that another employee was told to quit seeking help from Plaintiff because she was not a floor supervisor.  If this statement is offered to show that Plaintiff was not, in fact, a floor supervisor, it is hearsay.  Plaintiff testified that in 2003 or 2004 she was promoted to collection floor supervisor.  She stated that her duties included training, interviewing, hiring and assisting anyone with questions.[107]  She testified that between January 28, 2009, and February 10, 2009, AIH did not interview any potential hires nor was there a need for training of new individuals.[108]  Plaintiff testified regarding her supervisor status:

---

[105]*Id.* at 1138 (citations omitted), *see also Rivera v. City & Cnty. of Denver*, 365 F.3d 912, 924-25 (10th Cir. 2004).

[106]*Myers v. Colgate-Palmolive Co.,* 102 F. Supp. 2d 1208, 1218 (D. Kan. 2000), *aff'd,* 26 F. App'x 855 (10th Cir. 2002) (rejecting plaintiff's argument that no restructuring was necessary, or that some other employee should have had his position eliminated).

[107]*Id.* at 56–57.

[108]*Id.* at 65: 3–22.

Q.      On the morning of February 10th, 2008[sic], what was your title at AIH?
A.      I was still floor collector but—
Q.      What were your responsibilities?
. . . .

A.      It was to just go to my desk and to collect off medical.
Q.      Is it your testimony that you were no longer a supervisor at that point?
A.      No.
Q.      That's not your testimony?
A.      No.
Q.      You were still a supervisor?
A.      I was.
Q.      Okay.  Did AIH ever demote you?
A.      No, not that I'm aware of.[109]

The evidence shows that Plaintiff did not perceive a change in her status, and none of her duties changed.  She testified that there were no opportunities for interviewing or training before she was terminated.  Again, Plaintiff's own testimony shows that she did not suffer an adverse employment action by virtue of her alleged loss of supervisor status — a loss that she allegedly discovered only after she was terminated.

3)      Mr. Joyce's Harassment

Plaintiff's response suggests that Mr. Joyce's harassment can be an "adverse employment action" because the employer condoned it.  The Court is unclear as to Plaintiff's argument, and Plaintiff's response fails to make any legal arguments or to cite to any legal authority.[110] Lacking clarification as to Plaintiff's argument, the Court finds it to be without merit.

4)      Termination

The Court finds that Plaintiff has made a sufficient showing of causation and pretext to survive summary judgment on her claim of retaliation based on her termination.  "Proximity in

---

[109]Doc. 116-2, at 63: 22 – 64: 14.

[110]*See* Doc. 116, at 79.

time between the claim and discharge is a typical beginning point for proof of a causal connection."[111]  If temporal proximity is not close, "the claimant will need to produce additional evidence in order to show causation."[112]  Close temporal proximity between the complaint and the adverse action is also a factor in determining pretext.[113]  Plaintiff testified that she last complained to Ms. Thornhill approximately three months before her termination.  The Court finds that, viewing the evidence in the light most favorable to Plaintiff, the temporal proximity, along with her additional evidence, presents a triable question for the jury.

The Court finds that Plaintiff is able to point to specific facts establishing a triable issue that AIH's reason for her termination was pretextual.  AIH contends that after Plaintiff's transfer to a different job assignment, Plaintiff's attitude and performance deteriorated, she was caught playing computer games at work, and thus she was ultimately terminated.  AIH also alleges that this termination was in part due to AIH's desire to lower overhead to maintain economic viability.  AIH submitted evidence that its management had a subjective view of Plaintiff that she was disruptive and did not work well with others.

Plaintiff's evidence shows that she had only worked on the new medical collection route for six business days before she was terminated.  AIH would have had only this short amount of time to evaluate her performance on the new route.  Ms. Thornhill testified that she only runs the collection reports once a month and then sends them by e-mail to the collectors and payroll.[114]

---

[111]*Rebarcheck v. Farmers Coop. Elevator & Mercantile Ass'n of Dighton, Kan.*, 35 P.3d 892, 899 (Kan. 2001).

[112]*Id.*

[113]*Pastran v. K-Mart Corp.*, 210 F.3d 1201, 1206 (10th Cir. 2001).

[114]Doc. 116-9, at 45: 10–14.

Although Ms. Booze stated that after AIH transferred Plaintiff to the medical route, she witnessed Plaintiff playing computer games on AIH computers during work hours, Plaintiff testified that she only played solitaire one time at work, and it was during her regular afternoon break.[115]

Plaintiff testified that when she initially started working at AIH in 2001, the company had ten or twelve collectors.[116]  AIH had eleven employees in January 2008 and eleven employees in December 2009—nine months after Plaintiff was terminated.[117]  AIH hired six new collectors within six months of discharging Plaintiff.[118]  AIH advertised for the positions and did not call Plaintiff to see if she would like to be rehired.[119]

The Court finds that Plaintiff's pretext evidence, coupled with her evidence on her prima facie case, creates a genuine issue of material fact with regard to pretext.  The Court therefore denies AIH's motion for summary judgment on Plaintiff's retaliation claim based on her termination.

## IX.    Whistle-blower Retaliation under Kansas Law

Plaintiff fails to establish a cause of action for whistle-blower retaliation under the limited public-policy exception to Kansas' employment at-will doctrine.  When a retaliatory discharge claim is based on circumstantial evidence, Kansas courts apply the *McDonnell*

---

[115]Doc. 116-2, at 100: 10–18.

[116]*Id.* at 56: 4–9.

[117]Doc. 93, SOF ¶ 3.

[118]*Id.*

[119]Doc. 116-3, at 75: 20 –76: 2.

*Douglas*[120] burden-shifting framework.[121]   Under that approach, a plaintiff's establishment of a prima facie case creates a presumption of retaliation.[122]   The burden then shifts to the defendant to produce evidence that the adverse employment action was taken for a legitimate, nondiscriminatory reason.[123]   If the defendant meets this burden, the burden shifts back to the plaintiff to present evidence that the proffered reason was not the true reason for the employment decision.[124]

To establish a prima facie case of whistle-blower retaliation, a plaintiff must show that: (1) a reasonably prudent person would have concluded the employer was engaged in activities in violation of rules, regulations, or the law pertaining to public health, safety, and the general welfare; (2) the employer had knowledge of the employee's reporting of such violation prior to discharge of the employee; and (3) the employee was discharged for making the report.[125]   In addition, the whistle-blowing "must have been done out of a good faith concern over the wrongful activity reported rather than from a corrupt motive such as malice, spite, jealousy or personal gain."[126]

AIH argues that Plaintiff cannot establish a prima facie case of whistle-blower retaliation

---

[120]*McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973); *see also  Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981).

[121]*Foster v. Alliedsignal Inc.*, 293 F.3d 1187, 1193 (10th Cir. 2002); *Goodman v. Wesley Med. Ctr., L.L.C.*, 78 P.3d 817, 821 (Kan. 2003).

[122]*See, e.g.*, *Goodman*, 78 P.3d at 821.

[123]*See id.*

[124]*Id.*

[125]*Palmer v. Brown*, 752 P.2d 685, 689–90 (Kan. 1988); *see also Bergersen v. Shelter Mut. Ins. Co.*, 229 F. App'x 750, 754 (10th Cir. 2007).

[126]*Palmer*, 752 P.2d at 690.

for the following reasons: 1) Plaintiff did not report a serious violation of the laws relating to

public welfare; 2) AIH did not know that Plaintiff was the one who made the report; 3) Plaintiff

did not report to AIH management or law enforcement; and 4) Plaintiff's report was not done in

good faith.

The Court finds that the requirement that the report be made to company management or

law enforcement officials is dispositive on Plaintiff's whistle-blower retaliation claim.  Kansas is

an at-will employment state, and has long held that "in the absence of an express or implied

contract between an employee and employer regarding the duration of employment, either party

is free to end the employment at any time for any reason."[127]  Kansas courts have established

exceptions to this general rule, however, including that an employer may not terminate an

employee for reasons that "seriously contravene[ ] a very clear public policy."[128]  One of these

public-policy exceptions, referred to as the whistle-blower's exception, was first announced in

*Palmer v. Brown*.[129]  This cause of action, based on wrongful or retaliatory discharge, makes it

an actionable tort to "terminat[e] . . . an employee in retaliation for the good faith reporting of a

serious infraction of . . . rules, regulations, or the law by a co-worker or an employer to either

company management or law enforcement officials."[130]

The Court declines to accept the invitation to extend the public-policy exception to

include reports to outside third parties that do not hold the position of "law enforcement

---

[127]*Id.* at 687 (Kan. 1988) (*citing Johnston v. Farmers Alliance Mutual Ins. Co.,* 545 P.2d 312 (Kan. 1976)).

[128]*Morriss v. Coleman Co.,* 738 P.2d 841, 848 (Kan. 1987).

[129]752 P.2d 685 (Kan. 1988).

[130]*Id.* at 689–90.

officials."  The Kansas Supreme Court in *Palmer*, stated:

> Appellees argue that statutory exceptions to the right to terminate an employee at
> will are exclusive since it is generally the province of the legislature to declare
> public policy.  *Noel v. Menninger Foundation*, 175 Kan. 751, 267 P.2d 934
> (1954).  The legislature has nevertheless provided that "[t]he common law as
> modified by constitutional and statutory law, *judicial decisions*, and the
> *conditions and wants of the people*, shall remain in force in aid of the General
> Statutes of this state."  K.S.A. 77-109.  Before courts are justified in declaring the
> existence of public policy, however, "it should be so thoroughly established as a
> state of public mind so united and so definite and fixed that its existence is not
> subject to any substantial doubt."  175 Kan. 751, Syl. ¶ 4, 267 P.2d 934.[131]

In *Fowler v. Criticare Home Health Services, Inc.,*[132] the court held that the evidence

regarding the employee's report to UPS did not meet the *Palmer* standard, because "[i]t does not

qualify as a report to higher management at the company or to law enforcement."[133]  The court

stated:

> There was nothing about the fact that Fowler worked for a smaller company that
> prevented him from reporting to law enforcement, if he felt company reporting
> avenues were closed to him. . . . A worker who wants to come under the
> protections of that decision [*Palmer*] must seek out the intervention of a higher
> authority, either inside or outside the company.[134]

In refusing to extend the *Palmer* protection to situations in which an employee has

merely threatened to blow the whistle prior to his or her discharge, the court stressed that "[w]e

— and litigants — must remember that *Palmer's* holding defines an exception in

employer/employee relations rather than the rule."[135]  In discussing the decision in *Fowler*, the

---

[131]*Id.* at 687–88 (emphasis in original).

[132]10 P.3d 8 (Kan. Ct. App. 2000), *aff'd* 26 P.3d 69 (Kan. 2001).

[133]*Fowler*, 10 P.3d at 15.

[134]*Id.*

[135]*Id.*

court in *Shaw v. Southwest Kansas Groundwater Management District Three,* found that "[t]he critical point in *Fowler* is that the whistleblower must seek to stop unlawful conduct through the intervention of a higher authority, either inside or outside the company."[136]  Because the Court is dealing with a narrow exception that is a matter of Kansas  public policy, the Court declines to extend the exception by defining "higher authority outside the company" to include a third party such as Coventry.  Such an extension is the province of the Kansas courts or legislature.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant's Motion for Summary Judgment (Doc. 92) is GRANTED IN PART and DENIED IN PART.

**IT IS FURTHER ORDERED THAT** summary judgment shall be granted to Defendant on Plaintiff's claims under Title VII, on Plaintiff's age discrimination claims under the ADEA and the KAAD, on Plaintiff's claim of a sexually hostile work environment under the KAAD, on Plaintiff's claims of retaliation under § 1981 and the KAAD that are not based on her termination, and on Plaintiff's claim of whistle-blower retaliation under Kansas law.

**IT IS FURTHER ORDERED THAT** summary judgment shall be denied on Plaintiff's claim of a racially hostile work environment under § 1981 and the KAAD, and on Plaintiff's claim of retaliation based on her termination under § 1981 and the KAAD.

**IT IS SO ORDERED.**

Dated: <u>March 9, 2012</u>

        <u>S/ Julie A. Robinson</u>
        JULIE A. ROBINSON
        UNITED STATES DISTRICT JUDGE

---

[136]219 P.3d 857, 863 (Kan. Ct. App. 2009) (citation omitted).